**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY
11201 Tel: (718) 330-1200  Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director and Attorney-in-Chief*

Michelle A. Gelernt
*Attorney-in-Charge*

July 7, 2025

**BY ECF**

The Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

Re: *United States v. Eugene Tufaro*, 25-cr-73 (KAM)

Dear Judge Matsumoto,

     Eugene Tufaro was deeply addicted to heroin for over a decade. In the throes of his addiction, he began selling drugs to make the money he needed to sustain his drug dependency. His arrest forced him to confront not only what he had done in the instant case, but how his decade-long addiction had corroded his life. With the help and support of the Pretrial Opportunity Program ("POP"), Mr. Tufaro has been drug-free for the last eighteen months. He has obtained and held two jobs simultaneously, continued to show commitment to his substance use and mental health treatment, and rebuilt bonds with his family. He has proven that second chances can be redemptive, and that he is capable of living as a stable, law-abiding member of society.

     Section 3553(a) requires a sentence that is "sufficient, but not greater than necessary" to satisfy the goals of just punishment, deterrence and rehabilitation. For the reasons detailed below, a downward variance is warranted in Mr. Tufaro's case, and we ask the Court to consider a non-incarceratory sentence.

     **I.**     **A Jarring Loss**

     Eugene Tufaro was fortunate to grow up in a stable, loving household. His parents, Eugene Jr. and Cheriann, were childhood sweethearts and, together, they raised four children. When Mr. Tufaro looks back on his childhood, he recalls family dinners at his grandfather's house every Sunday. He reminisces about yearly family vacations. He remembers a family that valued quality time and closeness.

1

When he was twenty-two, Mr. Tufaro began dating Kaitlin Hunter. What began as an infatuation grew into a deep and serious relationship; the two moved to Florida, where they purchased a home and made plans to build their own family. Mr. Tufaro reflects on their relationship as being the happiest time in his life: she brought out the best in him and taught him what love was. When he was twenty-five, Mr. Tufaro and Kaitlin moved back to Staten Island, and Mr. Tufaro secured a job with the carpenters union. One day, Mr. Tufaro and his girlfriend got into an argument, and she stormed out of their place to head to work. He did not know it at the time, but this would be the last time he would ever see her. That night, instead of coming home to Mr. Tufaro, she stayed over at a friend's house and died in her sleep, later understood to be a result of severe sleep apnea. The loss of Kaitlin left him shocked and devasted.

Mr. Tufaro was ill-equipped to deal with Kaitlin's death. While in Florida for her funeral, an acquaintance offered him Percocet to help him cope with the grief. Mr. Tufaro, who up to that point had never used substances of any kind—not even alcohol or marijuana—was ignorant to the repercussions of the decision he was about to make. He accepted the pills and, finding that they numbed the pain, he continued to take Percocet for the remainder of his time in Florida. When he returned to New York a couple of weeks later, he was experiencing severe withdrawal and soon discovered that he could buy Percocet on the street. This marked the beginning of a debilitating opioid dependency that would ravage Mr. Tufaro's health, work, and personal relationships.

## II.     A Decade of Addiction

To satisfy his addiction, Mr. Tufaro continued to take Percocet. One day, unable to purchase Percocet, a friend offered him heroin instead. This was not the first time she had made such an offer but, seeing the marks and scars on her body from years of drug use, he had always declined. This time, however, he was hurting: the symptoms of withdrawal were so intense that he finally caved and tried heroin. From that moment, he was hooked. His addiction quickly became so intense that he could no longer function in his day-to-day life. Initially during this period, he worked at a local pizza shop that had employed him on and off since he was a teenager; as soon as he left work, he would spend his entire day's wages on heroin. Yet his heroin use was costly and, as his addiction worsened, his financial situation became more dire. He consumed approximately twenty bags a day (PSR ¶ 63), equivalent to a gram of heroin[1]; this would cost upwards of $1,400 a week.[2]  The pizzeria eventually let him go, explaining that they could no longer employ him while he used drugs. Jobless and desperate for cash to maintain his addiction, he began selling drugs to other addicts like himself.

In 2016, Mr. Tufaro was arrested for felony possession of a controlled substance in Richmond County; he served a custodial sentence of two years. His time in prison unfortunately did little to cure him of his addiction. When he was released, Mr. Tufaro tried to maintain a life of sobriety, but he had not gained any tools for how to navigate temptation, nor regulate the

---

[1] *See* Destiny Bezrutczyk & Ashish Bhatt, *How Much Do Drugs Cost: The Steep Price Of Addiction*, ADDICTION CTR. (May 19, 2025), https://www.addictioncenter.com/drugs/how-much-do-drugs-cost/.

[2] *See id.*

2

emotional highs and lows of re-entering the community. Soon, he fell back to regular heroin use, his dependance again grew, and in order to feed his habit, he sold drugs to other addicts like himself. It is perhaps unsurprising that a jail sentence did not prove rehabilitative for Mr. Tufaro: the easy access to drugs, combined with the lack of adequate therapy and treatment, muddied the road to recovery. Moreover, in prison he lacked community support, which ultimately made all the difference for him on his current journey to sobriety.

### III. A Long Struggle for Sobriety

Now eighteen months drug-free, Mr. Tufaro has transformed his life. He is employed, goal-oriented, and in full compliance with the requirements of his supervision. Yet the path to his sobriety has not been linear. Mr. Tufaro's journey has included missteps and setbacks, particularly at the beginning of this case.

When he was arrested for the instant offense, Mr. Tufaro had sunken deeper into the depths of addiction than ever before. Mr. Tufaro recalls a day, shortly before he was arrested, when he took stock of his situation. The drugs had ravaged his body. He felt ill even when he was using. He was physically and mentally exhausted by his addiction, which had overcome virtually every aspect of his day-to-day existence. He needed to use heroin, which often contained fentanyl, simply to function. While he understood the gravity of a federal arrest instantly, it was no magic bullet, at least not initially: his continued substance abuse resulted in several pre-trial violations and police contact.[3]

When Mr. Tufaro was initially arrested in this matter in April 2023, he was released on bond with the condition that he immediately go to a month-long inpatient detoxification program. He was extremely ill for several weeks, but he persevered and was able to successfully complete the program. Once he was released, he returned to live with his family and began out-patient rehabilitation. But he struggled to maintain his sobriety and soon relapsed. In August, he was in a serious motorcycle accident, which left him bedridden. This was a major turning point for Mr. Tufaro. While he was recovering from his injuries, he was placed on home detention, and he began virtual drug treatment. By December, he transitioned to medication-assisted treatment (methadone) to aid in his rehabilitation and had recovered enough to begin attending in-person treatment multiple times a week.

### IV. Entering the Pretrial Opportunity Program ("POP")

When he learned about POP, Mr. Tufaro was eager to enroll, but he was far from an ideal candidate. Thankfully, the judges who run POP were willing to give Mr. Tufaro a chance, with the recommendation of his Pre-trial Officer and the consent of the U.S. Attorneys' Office. But first, he would need to prove himself a suitable candidate. In light of his long history of addiction, pre-trial violations, and criminal record, this was no small feat, but Mr. Tufaro submitted himself wholly to his recovery. In the months leading up to his admission to POP, he continued getting treatment, regularly tested negative for substances, and consistently reported to

---

[3] Mr. Tufaro was arrested in Richmond County for assault, drug possession, and driving under the influence, but the charges were ultimately dismissed. *See* PSR ¶ 44-46.

3

Pre-trial Services. Even before he was formally enrolled, he attended POP sessions monthly, impressing the judges with his commitment to attaining sobriety and his brutal honesty with the group about the challenges he was facing in his recovery.

Mr. Tufaro was finally permitted to officially enroll in POP in April 2024. His successes in POP stand in stark contrast to his prior history of relapse. He is differently situated this time: he has had mental health counseling and medication-assisted treatment. He has been bolstered by his community. POP has been a cornerstone of support for him. Mr. Tufaro remembers feeling intensely nervous the first time he attended POP, worrying the judges would see him as a failure because of his addiction. He was surprised to find that they not only understood the challenges associated with addiction, but also were invested in supporting and encouraging him. He recalls some hard times while he was enrolled in the program, particularly when he struggled to find employment for six months, despite filling out nearly 50 job applications. Mr. Tufaro looks back gratefully on the judges' optimism and reassurance during that period. Mr. Tufaro has worked hard at his recovery, and it has yielded impressive results: he has been completely sober since January 2024. In April 2025, he officially graduated from POP and received his completion certificate and sobriety chip, an incredibly proud moment for him (Exhibit A, POP Certificate and Sobriety Chip). Even after successful completion, Mr. Tufaro has continued to attend POP sessions because he likes to show up for other participants and offer them encouragement; he wants to use his own struggles and successes to serve as an example for others.

### V. A Stable Life Defined by Hard Work and Hope

Since last year, Mr. Tufaro has obtained and maintained two jobs, one in the produce department of Stop & Shop, the other in the deli department of BJ's Wholesale Club; between these positions, he works an average of sixty hours per week. Even though he works long hours doing tasks that some would consider tedious and thankless, he takes great pride in his work. His co-workers jokingly refer to him as the manager, as he is detail-oriented, meticulous, and believes in doing things the right way. When new staff are hired, Mr. Tufaro will train them, even without being asked to do so by management. He recalls one co-worker, Kevin, who started a few months ago at BJ's; he saw that the young man was anxious starting in a new job, so Mr. Tufaro went out of his way to help ease his nervousness, mentoring him and teaching him the skills necessary to do the job competently and independently. But his co-workers are not the only ones who notice his diligence and exacting work ethic. There is a contingent of customers who will only come in to get their cold cuts on Mondays, when Mr. Tufaro is working, and won't let anyone else service them; they appreciate his friendly demeanor and his precise, neat way of preparing their orders.

Despite his grueling hours, Mr. Tufaro consistently makes time to show up for those he loves. He stays in close contact with his two sisters, who both live on Staten Island, and his brother, who recently moved to South Carolina. He is very involved with his nieces and nephew, and enjoys taking them to the movies, the park, and out to eat. He has begun to teach his nephew to fly model airplanes but, not wanting his niece to feel left out, he bought her a kite and taught her to fly it. These acts of service are perhaps Mr. Tufaro's strongest expression of love for his family and friends. Whenever his family, neighbors, or friends need something repaired, Mr. Tufaro will appear, ready to patch a leaky pipe, mend a broken carburetor, or fix a

4

malfunctioning water heater. "His work ethic is tireless and genuine kindness," remarked his long-time neighbor, "He doesn't seek recognition; he simply shows up, time and time again, for the people around him" (Exhibit B, Letter from Jodi Hannula). He enjoys helping the people in his life, a practice he learned from his father.

Mr. Tufaro's father has played a substantial role in his life, as he was a role model and a source of support and unconditional love, even during Mr. Tufaro's struggles with substance use. When his father passed away unexpectedly right after Father's Day last year, Mr. Tufaro was devastated. This loss, which could easily have triggered a relapse, instead serves as a testament to Mr. Tufaro's unwavering commitment to his sobriety. "I needed to stay sober so people could lean on me," he told me. While he once turned to substances to cope with his grief, this time he channeled his sadness into showing up for his family. As his sister Stephanie reflected in her letter of support:

> Over the past year, our family has endured significant loss. We lost both our grandfather and our father—two men who were central to our lives. In the face of this grief, my brother became a pillar of strength, not just for me, but especially for our mother and our elderly grandmother. He has stepped into a role that many would have avoided, offering daily support, emotional comfort, and physical help with no hesitation or complaint (Exhibit C, Letter from Stephanie Gumb).

Since his arrest, Mr. Tufaro has steadily and assiduously built up his life piece by piece, finding fulfilment in his work and his relationships with family. He also makes time to cultivate various hobbies, as he enjoys flying model airplanes at the local boardwalk, rollerblading, and caring for his pet rabbit, Coco. As his brother-in-law explains, "He has found joy in simple, positive things, and he surrounds himself with purpose rather than temptation" (Exhibit D, Letter from Harold Gumb).[4] Where addiction once shackled his thoughts, he now has the freedom to contemplate his future. He envisions a job in sanitation or as a professional welder. He hopes to one day take piloting lessons, imagining flying far higher than his model planes ever could.

### IV. Given Mr. Tufaro's Success in POP, a Non-Incarceratory Sentence Will Best Effectuate the Goals of Sentencing

In light of the applicable sentencing factors, a sentence of probation or supervised release is sufficient, but not greater than necessary, to comply with the purposes of sentencing. Mr. Tufaro's history and characteristics strongly favor a probationary sentence designed to continue his progress, both in his personal and professional life. For the first time in a long time, he has found a sense of accomplishment and confidence in his work. Even though he is successfully holding down two jobs, he is determined to better his prospects and is actively applying and interviewing for full-time jobs so that he can achieve a better work-life balance and qualify for benefits. Mr. Tufaro's enrollment in POP has been crucial to his personal and professional progress and, while he feels deep remorse for his actions in the instant case, he feels profound gratitude to the Court for giving him the opportunity to cultivate a life of stability and sobriety. An incarceratory sentence would demolish the life that Mr. Tufaro has so painstakingly built

---

[4] Additional letters of support are attached as Exhibits E-G.

since his arrest: it would sever him from the family that depends on him, strip him of the progress he has made in his work, and, above all, serve as a rebuke to the tremendous strides he has made in his recovery.

Many successful graduates of POP have received non-incarceratory sentences from courts in this District. *See United States v. Stephen Delpriore*, No. 17-CR-91, (RJD) (sentenced to time served and three years supervised release on October 6, 2020); *United States v. Rainelle Moore*, No. 17-CR-499 (RJD) (sentenced to time served and one year supervised release on December 16, 2020); *United States v. Michael Hitsous*, No. 18-CR-24 (RJD) (sentenced to time served and three years supervised release on January 28, 2020). Some participants have even achieved dismissals of their cases entirely upon successful program completion. *See United States v. Francis Zolata*, No. 22-CR-472, (AMD) (dismissed March 23, 2025); *United States v. Edmund Perry*, No. 22-CR-132 (HG) (dismissed January 8, 2024); *United States v. Anthony Murino*, No. 18-CR-64 (RJD) (dismissed July 8, 2022). Indeed, several judges in this District have expressed the considerable value they place on POP at sentencing; in 2022, they wrote to the Sentencing Commission to encourage the Commission to amend the Sentencing Guidelines to include successful participation for court-sponsored diversion programs like SOS and POP as a ground for downward departure.[5] In light of Mr. Tufaro's success in POP and the considerable progress he has made in his personal and professional life since the time of his arrest, a sentence of probation would be "sufficient, but not greater than necessary" to best effectuate the purposes of sentencing.

V.     **Conclusion**

Since his arrest, Mr. Tufaro has worked hard to rebuild his life and to prove himself worthy of the opportunity this Court has given him to better his life. He has maintained steady employment, supported his family, and demonstrated his commitment to maintaining sobriety and stability in his life. His progress is a testament not only to his perseverance, but to the power of second chances. His experience in POP has been redemptive and has, in the truest sense, changed his life. For these reasons, we ask this Court to impose a non-incarceratory sentence.

Respectfully Submitted,

*Kathryn Wozencroft*
Kathryn Wozencroft
Assistant Federal Defender

*Christina Lopez*
Christina Lopez
Legal Intern

---

[5] *See* UNITED STATES SENTENCING COMMISSION, *Public Comment from October 17, 2022 on Proposed Priority #12 - Diversion/Alternatives to Incarceration Programs: U.S. District and Magistrate Judges of the Eastern District of New York: Judges Dearie, Mann, Donnelly, Azrack, Pollack, Seybert, Brown, and Wicks*, https://www.ussc.gov/policymaking/public-comment/public-comment-october-17-2022 (last visited June 30, 2025).